1999-NMSC-018

979 P.2d 718

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Aaron MARTINEZ, Defendant–Appellant.**

No. 24,722.

Supreme Court of New Mexico.

April 7, 1999.

Phyllis H. Subin, Chief Public Defender, Susan Roth, Assistant Appellate Defender, Santa Fe, for Appellant.

Patricia A. Madrid, Attorney General, Max Shepherd, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

SERNA, Justice.

{1} Defendant Aaron Martinez appeals his convictions of first degree murder and conspiracy to commit murder. Martinez contends that the trial court erred in admitting his pre-arrest statements to police. We conclude that the trial court properly admitted these statements because Martinez knowingly, intelligently, and voluntarily waived his right against self-incrimination. Martinez also contends that the trial court erred by admitting evidence of his involvement in a prior shooting. We conclude that the trial court did not abuse its discretion in admitting this evidence to show consciousness of guilt. We affirm Martinez's convictions.

### I. Facts

{2} On the morning of March 10, 1995, the police found the bodies of April Jaramillo and James Morgan in Morgan's car. Both Jaramillo and Morgan had been shot with a .25 caliber gun. On the same morning, the police found the body of Hector Aponte in a separate location. Aponte had been killed with a shotgun.

{3} The police connected the .25 caliber gun responsible for the deaths of Jaramillo and Morgan with a prior shooting incident involving Martinez. As a result, the police picked up Martinez from his apartment for questioning regarding the three murders. The police told Martinez's mother, who was present at the apartment, that he was being questioned about a shoplifting incident, though the police later informed Martinez on the way to the police station that the interview would not concern shoplifting. During questioning, Martinez told police that he sold drugs for Pedro Gonzales and that Jaramillo and her boyfriend, Aponte, both owed Gonzales money for drugs. He also told police, after several changes to his story, that he gave his .25 caliber gun to Francisco Cuellar the night before the killings and instructed Cuellar to collect the drug money from Jaramillo and Morgan. Throughout the interview, Martinez denied killing Jaramillo, Morgan, and Aponte.

{4} The police also questioned Martinez about the prior shooting incident involving the .25 caliber gun. Martinez originally told police that on February 22, 1995, about two and a half weeks before the killings, Marvin Sandoval drove past Martinez's house and shot at him but Martinez did not return fire. Further into the questioning, however, and after being confronted with a ballistics report from a bullet extracted from one of Marvin Sandoval's tires, Martinez acknowledged that he returned fire at Sandoval with his .25 caliber gun.

{5} Following Martinez's first interview, the police consulted with the district attorney's office and decided to interview Martinez a second time due to the exclusion of Martinez's mother from the first interview. Martinez's mother attended the second interview, and Martinez gave a substantially similar statement to the police.

{6} At trial, the State introduced both of Martinez's statements to the police, including Martinez's responses to questions about the earlier shooting incident involving Marvin Sandoval. In addition, a police officer testified for the State that he removed a bullet

from Marvin Sandoval's tire, and another officer testified that the bullet matched the bullets responsible for the deaths of Jaramillo and Morgan.

{7} In addition, the State introduced evidence concerning the circumstances surrounding the killings. Several witnesses testified, in accordance with Martinez's own statements to police, that Jaramillo and Aponte owed Pedro Gonzales money for drugs and that Martinez sold drugs for Gonzales. In addition, Martinez told police that he and Gonzales went to Aponte's residence on March 9, 1995, the night preceding the killings, in order to get the drug money. Three witnesses confirmed this information. The same three witnesses, one of whom was Aponte's neighbor at the time and had not previously seen Martinez and one of whom was Martinez's cousin, also testified that Martinez had a sawed-off shotgun underneath his coat at that time that became visible because Martinez accidentally dropped it. Martinez had maintained throughout both interviews with police that he did not have a shotgun at Aponte's house.

{8} The State introduced evidence that Aponte died from a single shotgun wound to the upper left arm and chest on the morning of March 10, 1995. The State linked Aponte's and Jaramillo's killings by their relationship, by the fact that both owed drug money to Gonzales, by the date of their deaths, and by the weapons used to kill them, showing that Gonzales and Martinez had the .25 caliber gun and a shotgun at Aponte's residence and that both guns were seen together at the home of Louis Montoya, another cousin of Martinez, after the killings. In addition, police found Aponte's wallet, with his driver's license, in Morgan's car during the investigation into the shooting of Jaramillo and Morgan.

{9} Additionally, with respect to the conspiracy charge, the State introduced evidence that Martinez entered into an agreement with Cuellar to kill Jaramillo and Morgan. Martinez told police that, when he and Gonzales met Cuellar on the night of the killings, Martinez gave his .25 caliber gun to Cuellar and instructed Cuellar to get the drug money from Jaramillo and Morgan because the latter "always had tools and stuff." Martinez denied in his police interviews that he instructed Cuellar to kill Jaramillo and Morgan.

{10} The State also introduced evidence that Cuellar intentionally killed Jaramillo and Morgan. Witnesses placed Cuellar at Morgan's motor home during the early morning hours of March 10, 1995. In addition, a witness testified that Cuellar left with Jaramillo and Morgan in Morgan's car near the established time of death. Further, police found Cuellar's fingerprint in the backseat of Morgan's car. Finally, a witness testified that Cuellar bragged about killing Jaramillo and Morgan in exchange for drugs from Gonzales.

{11} A jury found Martinez guilty of trafficking a controlled substance, see NMSA 1978, § 30–31–20 (1990), conspiracy to commit trafficking, see NMSA 1978, § 30–28–2 (1979), tampering with evidence, see NMSA 1978, § 30–22–5 (1963), conspiracy to commit tampering, see § 30–28–2, the first degree murder of Aponte, see NMSA 1978, § 30–2–1 (1994), and conspiracy to commit the murders of Jaramillo and Aponte, see § 30–28–2. Martinez appeals only the latter two convictions, contending that the trial court erred in admitting his statements to the police and erred in admitting evidence of the prior shooting incident involving Marvin Sandoval.

## II. Statements to Police

{12} Martinez argues that the trial court should have excluded his statements to the police because the State failed to demonstrate that Martinez knowingly, intelligently, and voluntarily waived his constitutional right against self-incrimination. Specifically, Martinez contends that the statements should have been suppressed due to Martinez's age at the time of the statements, the fact that the police excluded his mother from the first interrogation by misleading her about the subject of the interview, and the fact that, although Martinez answered questions after being advised of his rights, the police did not obtain an express waiver of rights, either oral or written, from Martinez. We disagree.

■ {13} The Fifth Amendment to the United States Constitution, applied to the States through the Fourteenth Amendment, *see Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), secures a criminal defendant's right against self-incrimination.[1] In order to protect this right, law enforcement officials conducting a custodial interrogation must advise a suspect "that he [or she] has a right to remain silent, that any statement he [or she] does make may be used as evidence against him [or her], and that he [or she] has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Prior to questioning the individual, the police must first obtain a knowing, intelligent, and voluntary waiver of these rights. *Id.*

■ {14} In response to a defendant's motion to suppress a statement made to police, the State bears the burden of demonstrating by a preponderance of the evidence that the defendant knowingly, intelligently, and voluntarily waived the constitutional right against self-incrimination. *See Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The State must demonstrate that the waiver of rights "was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Courts evaluate " 'the totality of the circumstances and the particular facts, including consideration of the mental and physical condition, background, experience, and conduct of the accused,' " as well as the conduct of the police, in determining whether the State has successfully carried its burden in demonstrating a knowing and voluntary waiver. *State v. Salazar,* 1997–NMSC–044, ¶ 62, 123 N.M. 778, 945 P.2d 996 (quoting *State v. Boeglin,* 100 N.M. 127, 132, 666 P.2d 1274, 1279 (Ct.App.1983)). "[E]very reason-

able presumption against waiver is indulged." *Id.*

{15} On appeal,

> we accept the factual findings of the district court unless they are clearly erroneous, and view the evidence in the light most favorable to the district court's ruling. The ultimate determination of whether a valid waiver of Fifth Amendment rights has occurred, however, is a question of law which we review de novo.

*United States v. Toro–Pelaez,* 107 F.3d 819, 826 (10th Cir.1997) (citations omitted).

## A. Applicability of the Children's Code

■ {16} Martinez argues that the provisions of the Children's Code governing statements to the police by delinquent children apply to his statements because he was seventeen years old at the time of the questioning. *See* NMSA 1978, § 32A–2–14(C) to –14(E) (1993) (requiring that a delinquent child be advised of the child's constitutional rights and give a knowing, intelligent, and voluntary waiver of rights prior to being interrogated; requiring the State to prove a valid waiver of rights prior to admission of a statement at trial; and outlining the factors a court should consider in determining whether the State sufficiently proves a valid waiver). The State contends, on the other hand, that Section 32A–2–14(D) applies only to "a delinquent child," *see* NMSA 1978, § 32A–2–3(B) (1993, prior to 1995 & 1996 amendments) (defining a delinquent child as "a child who has committed a delinquent act"), and that Martinez is a serious youthful offender, Section 32A–2–3(H) (defining serious youthful offender). The State therefore contends that Section 32A–2–14 does not apply because the Legislature has specifically provided that a serious youthful offender "is not a delinquent child." Section 32A–2–3(H).

{17} Section 32A–2–3(H) defines a serious youthful offender as "an individual sixteen or seventeen years of age who is charged with and indicted or bound over for trial for first degree murder." The State charged Mar-

---

1. Martinez does not rely on the New Mexico Constitution for his arguments, *see* N.M. Const. art. II, § 15; we therefore limit our discussion of constitutional principles to the Fifth and Four-

teenth Amendments. *See State v. Gomez,* 1997–NMSC–006, ¶¶ 22–23, 122 N.M. 777, 932 P.2d 1 (discussing preservation requirements for a claim based on state constitutional law).

tinez with first degree murder and a grand jury indicted him for that crime. Thus, the State correctly identifies Martinez as a serious youthful offender. However, at the time the police questioned Martinez, he had neither been charged with nor indicted for first degree murder. Indeed, the purpose of the police interview was to determine Martinez's level of involvement, if any, in the three killings. If the police had surmised that Martinez committed only the crime of conspiracy or, for example, second degree murder, he would have been considered a delinquent child even after being charged and indicted. *See* Section 32A–2–3(C) (defining a delinquent offender), (I) (defining a youthful offender). Thus, we agree with Martinez that the provisions of Section 32A–2–14(E) guide our inquiry concerning the validity of Martinez's waiver of his constitutional rights.

{18} Nonetheless, we recognize that the application of Section 32A–2–14 to the statement of a juvenile makes little practical difference in evaluating a waiver of rights by a juvenile *over the age of fourteen.* *See* § 32A–2–14(F) (providing that statements by a juvenile under the age of thirteen are inadmissible and that "there is a rebuttable presumption that any confessions, statements or admissions made by a child thirteen or fourteen years old to a person in a position of authority are inadmissible"). For juveniles over the age of fourteen and in contrast to Section 32A–2–14(F), Section 32A–2–14(E) provides that,

> [i]n determining whether the child knowingly, intelligently and voluntarily waived the child's rights, the court shall consider the following factors:
>
> (1) the age and education of the respondent;
>
> (2) whether or not the respondent is in custody;
>
> (3) the manner in which the respondent was advised of his rights;
>
> (4) the length of questioning and circumstances under which the respondent was questioned;
>
> (5) the condition of the quarters where the respondent was being kept at the time he was questioned;

> (6) the time of day and the treatment of the respondent at the time that he was questioned;
>
> (7) the mental and physical condition of the respondent at the time that he was questioned; and
>
> (8) whether or not the respondent had the counsel of an attorney, friends or relatives at the time of being questioned.

Contrary to Martinez's contention that these factors establish a heightened protection for statements by juveniles, we have previously recognized that "[t]his list is essentially a codification of the totality-of-circumstances test" applied in evaluating a waiver of constitutional rights by an adult, though emphasizing some of the circumstances that may be particularly relevant for a juvenile, such as the presence of a relative or friend. *State v. Setser,* 1997–NMSC–004, ¶ 13, 122 N.M. 794, 932 P.2d 484. Thus, in evaluating the trial court's determination that Martinez knowingly, intelligently, and voluntarily waived his constitutional rights, we look to the totality of circumstances, giving particular emphasis to the factors listed in Section 32A–2–14(E).

## B. Validity of the Waiver of Rights

{19} The State does not dispute that the police interviews in this case constituted custodial interrogations invoking the protections of the Fifth and Fourteenth Amendments. Thus, we must determine the validity of Martinez's waiver of rights. Martinez contends that the State failed to satisfy its burden of establishing a knowing and voluntary waiver because he did not expressly waive his rights. Martinez misapprehends the State's burden. In *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), the United States Supreme Court addressed a similar contention. The Court explicitly rejected the argument that *Miranda* requires an express waiver of rights and directed that courts should, instead, evaluate the particular facts and circumstances of the interrogation in determining whether the waiver of rights is knowing and voluntary. *Id.* The Court later clarified that "[t]his totality-of-the-circumstances approach [from *Butler* ] is adequate to determine whether there has been a waiv-

er even where interrogation of juveniles is involved." *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). Thus, we do not require the State to prove that Martinez expressly waived his rights in order to demonstrate a constitutionally valid waiver.

{20} Martinez also contends that the police prevented a knowing and voluntary waiver of rights by excluding his mother from the first interview by way of deception. Although Section 32A–2–14(E)(8) directs courts to consider the presence or absence of an attorney, friend, or relative at the questioning, that is merely one of the factors relevant in determining the validity of a waiver of rights, and the Legislature has not established a requirement that parents be notified about a custodial interrogation of their juvenile child. Similarly, as a constitutional matter, "[t]here is no due process requirement that the juvenile's parents be notified for the waiver to be valid.... Rather, the lack of parental notification is one factor to consider in the totality of the circumstances." *United States v. Doe*, 155 F.3d 1070, 1073 (9th Cir.1998) (en banc); *accord United States v. Gonzales*, 164 F.3d 1285, 1290 (10th Cir.1999); *Roberts v. Commonwealth*, 18 Va.App. 554, 445 S.E.2d 709, 711 (1994).

{21} Reviewing the totality of circumstances surrounding the custodial interrogations in this case, we conclude that the State satisfied its burden of demonstrating a valid waiver. In determining a knowing and intelligent waiver of rights, we ascertain whether Martinez was fully aware of the nature of the right he was waiving and the consequences of abandoning the right. For this inquiry, we apply several of the factors listed in Section 32A–2–14(E): Martinez's age and education at the time of questioning, the manner in which he was advised of his rights, the length and time of day of the questioning, his mental and physical condition at the time of questioning, and the presence of counsel or a relative. We begin with a review of Martinez's waiver of rights at the first interrogation.

{22} At the time of questioning, Martinez was seventeen and a half years of age and was, thus, old enough to comprehend *Miranda* warnings and the consequences of waiving his rights. *State v. Jonathan M.*, 109 N.M. 789, 791, 791 P.2d 64, 66 (1990) ("[A] child over age fifteen is unlikely to make an involuntary statement ... after receiving *Miranda* warnings."); *see Setser*, 1997–NMSC–004, ¶ 14, 122 N.M. 794, 932 P.2d 484 (concluding that a sixteen-year-old defendant had sufficient intelligence to understand her rights and the repercussions of a waiver); *State v. Jones*, 566 N.W.2d 317, 324–25 & n. 4 (Minn.1997) (stating that the defendant's age of seventeen and a half, among other factors, "weighed in favor" of a conclusion that the waiver was knowing and intelligent). In addition, Detective Mike Schaller, one of the detectives who interviewed Martinez, testified that Martinez appeared "fairly intelligent" and able to understand the questions asked during the interview. He also testified that Martinez did not appear to be under the influence of alcohol or drugs and that Martinez answered questions in a coherent and rational manner. Further, the interview was not particularly long, lasting only approximately one hour, and was conducted at a time of day, between 9:00 and 10:00 p.m., when officers could expect Martinez to be alert and cognizant of the significance of the interview. Finally, Detective Schaller read Martinez his *Miranda* rights in full and repeated twice to Martinez that, if he chose to answer questions, he could stop the interview or refuse to answer questions at any time. Martinez stated that he understood these rights and that, in fact, he had previously been advised of these rights. Detective Schaller opened the interview by explaining to Martinez that his name had come up in relation to a triple homicide and that he wanted Martinez to explain some of the evidence that had thus far been gathered. Martinez began answering questions immediately after being advised of his rights and did not indicate in any way that he wished to speak to an attorney or a relative before answering questions or that he did not wish to answer questions.

{23} While Martinez did not expressly waive his right against self-incrimination, we

believe this course of conduct indicates an implied waiver of rights by Martinez. Additionally, even though Martinez did not have a relative present, the totality of circumstances clearly indicate that Martinez fully understood the nature of his rights and the consequences of his waiver. We therefore conclude that Martinez knowingly and intelligently waived his right against self-incrimination. *Cf. Conner v. State,* 334 Ark. 457, 982 S.W.2d 655, 660 (1998) (concluding that a seventeen-year-old defendant knowingly and intelligently waived his rights despite the absence of his parent); *Commonwealth v. Williams,* 388 Mass. 846, 448 N.E.2d 1114, 1119 (1983) (concluding that a seventeen-year-old defendant knowingly and intelligently waived the right against self-incrimination and that, because the individual did not appear immature for his age or under the influence of drugs, the fact that he had no relative living in the state did not "interfere[ ] with the defendant's ability to make a voluntary and knowing waiver"); *Jones,* 566 N.W.2d at 325 (similar).

{24} We next address whether Martinez voluntarily waived his rights or whether it was a product of intimidation, coercion, or deception by the police. Martinez contends that the custodial surroundings of the interview with six officers in the room created an unduly coercive environment. However, viewing the evidence in the light most favorable to the district court's ruling, it appears that only two officers, including Detective Schaller, directly questioned Martinez and that the other four officers came in and out of the room to inform Detective Schaller of the events occurring in interviews with other suspects in the case. In addition, Detective Schaller and Martinez's mother testified that he had numerous previous contacts with law enforcement, which would have made the surroundings much less intimidating. *Cf. Fare,* 442 U.S. at 725–26, 99 S.Ct. 2560 (relying on a sixteen-and-a-half-year-old defendant's "record of several arrests" in concluding that the waiver of rights was constitutionally valid and discussing a difference between "young persons, often with limited experience and education and immature judgment," and "an experienced older juvenile with an extensive prior

record"). Further, the police did not use any type of threat or physical coercion in asking Martinez to answer questions. Although the police misled Martinez's mother about the subject of the interview at the time he was picked up for questioning, it appears that this was done as a matter of safety against possible retaliation from others for Martinez answering questions, and a police officer testified that he did not intend to deprive Martinez of the opportunity to have a parent present. Further, Martinez was fully informed about the subject of the interview immediately after being advised of his rights. *See Colorado v. Spring,* 479 U.S. 564, 575–77 & n. 8, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (refusing to require police to inform a suspect of the scope or subject of an interrogation but leaving unaddressed the situation of an affirmative misrepresentation to a suspect by police). Thus, this action did not have the effect of "trick[ing]" Martinez into waiving his rights. *Miranda,* 384 U.S. at 476, 86 S.Ct. 1602. Finally, our review of the interview reveals that Martinez's will was not overborne and that he spoke freely and voluntarily to the police, even maintaining throughout that he did not have a shotgun on the night of the killings, that he did not kill Aponte, and that, although he instructed Francisco Cuellar to obtain drug money from Jaramillo, he did not instruct Cuellar to kill her. Based on the totality of circumstances, we conclude that Martinez knowingly, intelligently, and voluntarily waived his rights in the first interrogation.

{25} Additionally, it is clear that Martinez's waiver of rights in the second interrogation was constitutionally valid. In addition to the circumstances present for the first interrogation, Martinez had considerable time, approximately three weeks, to reflect on his decision to speak to police by the time of the second interrogation. The police again fully advised Martinez of his *Miranda* rights during the second interview. Also, unlike the first interrogation, Martinez's mother attended the second interrogation and apparently encouraged Martinez to cooperate with police. Finally, there is no evidence that Martinez's second waiver was the product of coercion. In fact, in terminating the inter-

view, Martinez exercised his right against self-incrimination by telling the police that he did not want to answer any additional questions. Thus, we are convinced by the totality of circumstances that Martinez knowingly, intelligently, and voluntarily waived his rights in the second interrogation. Further, because the first interrogation was not a product of coercion,[2] any possible infirmity in the first interrogation would not taint the valid waiver Martinez gave at the second interrogation. *See Oregon v. Elstad,* 470 U.S. 298, 314, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) ("A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."). As a result, because Martinez gave a substantially similar statement to police during the second interrogation, we would uphold the trial court's decision to admit Martinez's statements from the first interrogation even if we had not rejected Martinez's assertion that the waiver from the first interrogation was defective. *See State v. Woodward,* 121 N.M. 1, 10, 908 P.2d 231, 240 (1995) ("The erroneous admission of cumulative evidence is harmless error because it does not prejudice the defendant."). Therefore, we conclude that the trial court properly admitted Martinez's statements to police during the first and second interrogations.

### III. Admissibility of Evidence of the Prior Shooting Incident

{26} Martinez contends that, under Rule 11–404(B) NMRA 1999 and Rule 11–403 NMRA 1999, the trial court erroneously admitted evidence of the prior shooting incident

involving Marvin Sandoval. In its answer brief, the State argued that Martinez's statements to police regarding the prior shooting were admissible to provide context to the jury concerning the reasons police began to suspect Martinez's involvement in the killings. In addition, the State argued that the evidence was properly admitted because, due to Martinez's inconsistent answers to police about firing his gun at Sandoval's car and the fact that the same gun was used to kill Jaramillo and Morgan, the statements demonstrated a consciousness of guilt. The State abandoned these claims at oral argument, conceding that the admission of the evidence was erroneous, and focused its position, instead, on the claim that the error was harmless. Nonetheless, as the Court of Appeals has previously discussed, *see State v. Maes,* 100 N.M. 78, 80–81, 665 P.2d 1169, 1171–72 (Ct.App.1983), appellate courts in New Mexico are not bound by the Attorney General's concession of an issue in a criminal appeal. *See State v. Foster,* 1999–NMSC–007, ¶ 25, 126 N.M. 646, 974 P.2d 140. As a result, we independently assess, under Rule 11–404(B) and Rule 11–403, the trial court's admission of evidence of the prior shooting.

{27} Rule 11–404(B) provides that [e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, *such as* proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

(Emphasis added). The list of permissible uses of evidence of other wrongs in Rule 11–

**2.** On appeal, Martinez highlights Detective Schaller's reference to the death penalty in the first interrogation. However, at the time of the reference, Martinez had already knowingly and voluntarily waived his rights, and Martinez does not argue that this reference rendered the statements themselves involuntary, an issue that was also not preserved below. *See State v. Fekete,* 120 N.M. 290, 298, 901 P.2d 708, 716 (1995) (stating that the validity of a waiver of rights is a separate question from the voluntariness of a confession). In any event, taken in context, we believe the reference was intended to impress Martinez with the seriousness of the matter and did not rise to the level of police misconduct or

cause Martinez's will to be overborne. *See id.* at 299, 901 P.2d at 717 (stating that police misconduct "is a necessary predicate to a finding that a confession is not 'voluntary' "); *see also Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) (opinion of Frankfurter, J.) (stating that a confession is involuntary if the defendant's "will has been overborne and [the] capacity for self-determination critically impaired"), *quoted in Spring,* 479 U.S. at 574, 107 S.Ct. 851; *cf. State v. Andrus,* No. 9504004126, 1996 WL 190031, at *8 (Del.Super.Ct. Jan.16, 1996) (concluding under similar circumstances that a defendant's statement was voluntary).

404(B) is intended to be illustrative rather than exhaustive, and evidence of other wrongs may be admissible on alternative relevant bases so long as it is not admitted to prove conformity with character. *See, e.g., State v. Peters,* 1997–NMCA–084, ¶ 13, 123 N.M. 667, 944 P.2d 896 ("New Mexico case law has generally regarded Rule 11–404(B) as being inclusive rather than exclusive...."), *cert. denied,* 123 N.M. 446, 942 P.2d 189 (1997).

■ {28} The State asserted in its brief-in-chief that the evidence of the prior shooting incident was admissible to show the jury the basis for initial police suspicion of Martinez's involvement in the killings. We have not previously recognized the basis for police suspicion of a defendant as a relevant non-character use of other crimes, wrongs, or acts under Rule 11–404(B), and we decline to do so in this case. *See United State v. Taylor,* 900 F.2d 779, 782 (4th Cir.1990) (concluding that evidence demonstrating the basis for initial police suspicion is irrelevant to a determination of guilt).

■ {29} The State also contended that the evidence of the prior shooting incident demonstrated a consciousness of guilt that is admissible under Rule 11–404(B). We agree. This Court has previously recognized the relevance and admissibility of evidence demonstrating a consciousness of guilt. *State v. Trujillo,* 95 N.M. 535, 541, 624 P.2d 44, 50 (1981) ("Evidence of flight or an aborted plan of flight is admissible and relevant because it tends to show consciousness of guilt."). In addition, the Court of Appeals has previously recognized that consciousness of guilt, like intent or motive, constitutes a permissible use of other acts or wrongs under Rule 11–404(B). *State v. Ruiz,* 119 N.M. 515, 519, 892 P.2d 962, 966 (Ct.App.1995) (concluding that evidence of a battery was admissible under Rule 11–404(B) because the State used the evidence to demonstrate that the defendant "was doing things consistent with admitting his guilt"); *cf. Skiver v. State,* 336 Ark. 86, 983 S.W.2d 931, 938 (1999) (stating that "when evidence of prior bad acts reflects a consciousness of guilt, it has independent relevance under [the Arkansas equivalent of Rule 11–404(B) ]").

■ {30} In this case, Martinez originally told police that Marvin Sandoval had shot at him but that he had not returned fire. Martinez changed his story after the police informed him that a bullet was found in Marvin Sandoval's tire shortly after the incident. A change in a defendant's story to the police may constitute evidence of a consciousness of guilt. *See State v. Lujan,* 103 N.M. 667, 674, 712 P.2d 13, 20 (Ct.App.1985) (stating that "an attempt to deceive the police" shows a consciousness of guilt that is admissible in the State's case in chief); *State v. Carter,* 196 Conn. 36, 490 A.2d 1000, 1006 (1985) (concluding that a defendant's "changes in his statements to the police" evidenced a "consciousness of his own guilt"). "[I]t remains within a trial court's discretion to admit evidence of a Defendant's prior acts under Rule 11–404(B) when the State shows that such evidence is relevant to a material issue" other than conformity with character. *Foster,* 1999–NMSC–007, ¶ 51. Thus, we conclude that the trial court did not err in determining that the evidence of the prior shooting incident was admissible under Rule 11–404(B), and we must next determine whether the trial court properly applied Rule 11–403.

■ {31} "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." Rule 11–403. "The trial court is vested with great discretion in applying Rule [11–403], and it will not be reversed absent an abuse of that discretion." *State v. Chamberlain,* 112 N.M. 723, 726, 819 P.2d 673, 676 (1991). Reviewing both probative value and the danger of unfair prejudice, we conclude that the trial court did not abuse its discretion in admitting Martinez's contradictory statements to the police regarding his involvement in the shooting incident with Marvin Sandoval.

{32} As outlined above, there was a great deal of evidence of Martinez's involvement in the killings in this case. However, Martinez denied having a shotgun and denied shooting, or agreeing to shoot, any of the victims. The State attempted to impeach Martinez's denial of involvement by introducing evidence indi-

cating a consciousness of guilt. For example, when confronted with charges of murdering Jaramillo *and* Aponte, Martinez asked why he was being charged with two counts of murder and told Detective Schaller, "I never killed April [Jaramillo]." Martinez also told his cousin to recant his statement to police that Cuellar had bragged about the killings. Finally, the State introduced another change in story during Martinez's interview tending to demonstrate a consciousness of guilt: before telling the police that he gave his .25 caliber gun to Cuellar, Martinez initially told police that he gave it to someone else prior to the night of the killings. Thus, the evidence of Martinez's initial denial of firing back at Marvin Sandoval assisted the State in demonstrating a pattern of Martinez's behavior indicating a consciousness of guilt.

{33} In addition, the police were able to link the bullets responsible for the deaths of Jaramillo and Morgan with the bullet removed from Marvin Sandoval's tire as a result of the prior shooting incident. Thus, the jury could reasonably infer from Martinez's original denial of involvement in the exchange of gunfire with Marvin Sandoval that he was attempting to conceal from police his possession of the .25 caliber gun.

{34} Martinez argues that the evidence of the prior shooting incident had little probative value because he was willing to stipulate at trial that he had the .25 caliber gun prior to the shootings. However, Martinez did not agree to stipulate to changing his story to the police. Martinez's stipulation would have deprived the jury of a permissible inference of a consciousness of guilt. In any event, the State was not bound to present its case to the jury through abstract stipulations. *Cf. State v. Sarracino*, 1998–NMSC–022, ¶¶ 21–22, 125 N.M. 511, 964 P.2d 72 (concluding that the trial court had not abused its discretion in allowing testimony despite the defendant's willingness to stipulate to its anticipated content); *State v. Tave*, 1996–NMCA–056, ¶ 15, 122 N.M. 29, 919 P.2d 1094 (refusing to require the State to accept a defendant's stipulation to his status as a felon in lieu of testimony establishing that

fact). Based on these circumstances, we believe that the evidence of Martinez's change in story regarding the prior shooting incident had significant probative value in demonstrating a consciousness of guilt.

{35} Additionally, we believe that the trial court did not act unreasonably in concluding that the evidence of the prior shooting did not present a sufficient danger of unfair prejudice to substantially outweigh its probative value. Although the prior shooting incident could have had the impermissible effect of making the jury believe that Martinez had a propensity to fire guns at other people, we believe several facts from Martinez's trial mitigate any potentially unfair prejudice. First, the nature of the prior shooting incident, in which Martinez fired at another after being fired upon, could be interpreted as an act of self-defense by the jury and was, thus, less likely to contribute to the jury's verdict. Additionally, the State introduced independent evidence that Martinez owned and routinely carried guns and that he distributed drugs for Gonzales on a regular basis, as well as evidence that Martinez demanded drug money from Aponte on the night of the killings while holding a shotgun. The trial court may have reasonably concluded that this other evidence would have a much greater potential for suggesting a violent character in comparison with the evidence of the prior shooting incident involving Marvin Sandoval and that, therefore, the evidence of the prior shooting did not present a substantial danger of unfair prejudice. *Cf. State v. Elinski*, 1997–NMCA–117, ¶ 26, 124 N.M. 261, 948 P.2d 1209 (concluding that the erroneous admission of a prior violent act did *not* constitute harmless error because "there was little or no other evidence purporting to show Defendant as a violent character"). Thus, we do not believe that the trial court's decision to admit Martinez's statements to police about his involvement in the prior shooting incident can be characterized as "contrary to logic and reason." *State v. Lucero*, 118 N.M. 696, 702, 884 P.2d 1175, 1181 (Ct.App.1994). We conclude that the trial court did not abuse its discretion in admitting this evidence.[3]

---

3. Although the trial court also admitted the testi-

mony of two police officers regarding the prior

## IV. Conclusion

{36} We determine that the trial court did not err in admitting Martinez's statements to police because he knowingly, intelligently, and voluntarily waived his right against self-incrimination. We also conclude that the trial court did not err in admitting Martinez's contradictory statements to police regarding his involvement in a prior shooting incident as evidence of a consciousness of guilt. We therefore affirm Martinez's convictions.

{37} **IT IS SO ORDERED.**

MINZNER, C.J., BACA and FRANCHINI, JJ., concur.

shooting incident, this testimony was merely cumulative of the police interview with Martinez and, thus, did not have any prejudicial effect on Martinez. *See Woodward*, 121 N.M. at 10, 908 P.2d at 240. We therefore need not consider whether the trial court properly admitted this testimony.