This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: June 24, 2024**

**No. S-1-SC-39555**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**LELAND HUST,**

Defendant-Appellant.

**CAPITAL APPEAL**
**George P. Eichwald, District Judge**

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Van Snow, Assistant Attorney General
Albuquerque, NM

for Appellee

## DECISION

**ZAMORA, Justice.**

**{1}** Defendant Leland Hust appeals his convictions for criminal sexual penetration of a minor and child abuse resulting in death. Defendant argues the district court abused its discretion by: (1) admitting Y-STR DNA evidence; (2) overruling defense counsel's objection to a comment made by the prosecutor during rebuttal argument; (3) preventing defense counsel from elaborating in closing argument on molestation allegations against Defendant's step-grandfather; (4) admitting portions of a police

interview when Defendant was alone and talking to himself; and (5) qualifying the lead detective as an expert in bloodstain pattern analysis.[1] We affirm.[2]

## I. BACKGROUND

## A. The Crime

**{2}**     Defendant lived in a home with eight other people, including his mother and stepfather; his step-grandparents; A.R., the victim; and A.R.'s mother. Winston Scates, Sr. (Scates, Sr.) is Defendant's step-grandfather. A.R. and her mother, who is an acquaintance of Defendant's step-grandparents, had moved into the home a few weeks before A.R.'s death.

**{3}**     In August 2018, six-year-old A.R. was sexually assaulted and killed. A.R. was last seen alive and unharmed around midnight. The next morning, A.R.'s mother discovered A.R. was dead. A.R. was found on a mattress in the room where she slept, her skin gray and purple. She wore only a t-shirt and had blood running down her thigh.

**{4}**     There was no sign of forced entry into the home where A.R. was found dead. However, household members had contact with A.R. prior to her death. Defendant's step-grandmother testified that during the afternoon prior to her death, Defendant and A.R. watched a movie and played in A.R.'s room. That evening, Defendant's step-grandparents hugged A.R. goodnight before she went to bed. Defendant claimed he did not lie on A.R.'s bed, had put a movie on for A.R. in her room before he went to bed, and was asleep when A.R. was sexually assaulted and murdered.

**{5}**     The police collected samples of various bloodstains and fabrics from the scene for DNA testing. The forensic pathologist from the Office of the Medical Investigator performed A.R.'s autopsy. The pathologist swabbed A.R.'s vagina and cervix for DNA evidence. The autopsy revealed A.R. had significant vaginal and anal injuries, including a tear that extended up to her cervix. According to the pathologist, A.R. could have been strangled to death or been suffocated or some combination of the two.

**{6}**     The police interviewed Defendant and all other household members the day A.R. was found raped and killed. Defendant was interviewed again by police several days later. Defendant said he did not know who hurt or killed A.R. and that he would never have hurt his "niece" in that way. Police interviewed Defendant again in early October 2018. During this interview, Defendant was confronted with the result of the DNA testing, which implicated him. After police informed Defendant of the DNA results, Defendant admitted he made A.R. "that way" and said "clearly I killed my niece."

---

1Defendant raised three additional issues in his statement of issues. However, we decline to review these issues because Defendant failed to address them in his brief in chief. *State v. Perea*, 2001-NMSC-026, ¶ 1, 130 N.M. 732, 31 P.3d 1006. *See also State v. McDowell*, 2018-NMSC-008, ¶ 34, 411 P.3d 337 (declining to review issues not argued in brief in chief in direct appeal).
2We resolve this case by non-precedential decision because settled law provides a clear basis for affirmance. *See* Rule 12-405(B)(1) NMRA.

Defendant went on to state, "I don't remember doing this to her. I want to die right now just knowing I'm the one that did it."

**{7}** At some point during the October interview, Defendant was left alone in the interview room and started talking to himself about "Whisper." The "Whisper references" include Defendant saying:

> When did I do it? When did I wake up in the middle of that dream? I had to have done it after falling asleep. I had to have woken up and go do something, go pee or something. I hope it didn't come out. I hope that thing did not come out again. I can't handle that thing. If that came out again . . . it's in the box. He's in the box. He didn't come out. There's no way. There's no way that one came out. There's no way that one came out, because when I woke up, that one was still in the box, it was still in the box.

**{8}** After he was arrested, Defendant offered A.R.'s mother another account of what happened in recorded telephone calls he made to her from jail. He explained Scates, Sr. was in A.R.'s room, dressed in a robe and armed with a revolver, and that when Defendant came into the room, A.R. was covered with blood and not breathing. Defendant told A.R.'s mother that Scates, Sr. made him "touch [A.R.] and clean up the mess" and made him "wipe up her area." When A.R.'s mother asked him if Scates, Sr. made him penetrate A.R., Defendant answered "yah" and said "I didn't get a hard on or anything." A.R.'s mother encouraged Defendant to write a letter explaining what happened. A handwritten note addressed to the investigating detectives was found in Defendant's cell. In the note, Defendant wrote: "What I was forced to see and do at gunpoint is enough to make me want to die . . . I wish to die for my part in that night . . . Even if proven innocent, I still would have offed myself."

## B. The Trial

**{9}** As a result of the investigation in this case and based on events that had occurred years prior to A.R.'s death, Scates, Sr. was charged with criminal sexual contact of a minor. The minor in that case was his granddaughter, who is not related to A.R. He pled guilty to that charge and is a registered sex offender. He testified about this offense at trial and was given immunity for his testimony. The defense cross-examined Scates, Sr., directly accusing him of having raped and killed A.R., which he denied.

**{10}** The State's forensic DNA expert was Eve Tokumaru. She examined the evidentiary samples taken from the crime scene. Ms. Tokumaru determined how much DNA was present in the samples and whether there was enough DNA to test. No semen was found. The testing Ms. Tokumaru did on the blood samples confirmed it was A.R.'s blood.

**{11}** Ms. Tokumaru also performed Y-STR amplification testing. Y-STR amplification is a form of DNA testing which differentiates a male lineage and is one way to determine whether there is male DNA in fluid samples collected from a female body. Because men

inherit their Y chromosomes from their fathers and fathers and sons have the same Y chromosome, Y-STR testing can only determine whether a man in a particular patrilineal line was the source of the DNA.

**{12}** The male Y-STR DNA profile from the vaginal swabs indicated a mixture of at least two male individuals. The major profile contained enough DNA for Y-STR testing. There was an untestable amount of the other male DNA in some of the evidentiary samples, including those from A.R.'s vagina and anus. None of these minor profiles contained enough DNA to be tested so no one could be eliminated as a contributor to the minor male DNA profiles. The Y-STR amplification results indicated Defendant could not be excluded as the source of male DNA found in A.R.'s bloodstains from the mattress, the bedsheet, a towel, the carpet, two pillows, a comforter, and the body bag. Nor could he be excluded as the source of the male DNA from the samples taken inside A.R.'s vagina. Defendant was the only member of his patrilineal line in the house the night A.R. was killed. Scates, Sr., as well as all other occupants of the house, were excluded as possible sources from the major Y-STR DNA profile taken from the evidentiary samples.

**{13}** The jury found Defendant guilty of intentional child abuse resulting in death and criminal sexual penetration of a minor. Defendant was sentenced to life imprisonment plus eighteen years. This direct appeal followed. *See* N.M. Const. art. VI, § 2; Rule 12-102(A)(1) NMRA.

## II.    STANDARD OF REVIEW

**{14}** We review the evidentiary issues on appeal for an abuse of discretion. The district court abuses its discretion only when its "ruling is clearly against the logic and effect of the facts and circumstances of the case" and is clearly untenable or not justified by reason. *State v. Bailey*, 2017-NMSC-001, ¶ 12, 386 P.3d 1007 (internal quotation marks and citation omitted). Our review of arguments which raise questions of constitutional law is de novo. *State v. Sena*, 2020-NMSC-011, ¶ 15, 470 P.3d 227.

## III.    ANALYSIS

### A.    The District Court Did Not Abuse Its Discretion in Admitting the Y-STR DNA Testimony of the State's Expert

**{15}** Defendant argues the district court abused its discretion in admitting testimony concerning Y-STR DNA. Defendant does not challenge the methodology or the correctness of the DNA testing or protocol completed by the State's expert. Rather, Defendant argues that the testimony of the State's DNA expert should have been excluded under Rule 11-403 NMRA because it was unfairly prejudicial and because it confused and misled the jury.

**{16}** As a threshold matter, we address the relevance of the challenged DNA testimony. Evidence is relevant if it tends to make more or less probable a fact that is of consequence in determining the action. Rule 11-401 NMRA. We resolve any doubt in

favor of admissibility. *State v. Stanley*, 2001-NMSC-037, ¶ 6, 131 N.M. 368, 37 P.3d 85. Here, there is no doubt the identity of the perpetrator was a fact of consequence at the trial given Defendant's assertion that he did not harm A.R. and his theory that Scates, Sr. sexually assaulted and killed A.R. Defendant himself identifies the disputed issue at trial as the identity of the perpetrator.

**{17}** The testimony of the State's DNA expert about her Y-STR DNA analysis went directly to identity since that analysis indicated Defendant could not be excluded as the source of male DNA found in A.R.'s bloodstains that were taken from the crime scene. Nor could Defendant be excluded as the source of the male DNA from the samples taken inside A.R.'s vagina. But Scates, Sr., was excluded as a possible source from the major Y-STR DNA profile taken from all the evidentiary samples. Given that the DNA expert's testimony made it more probable that Defendant was the perpetrator, it clearly meets the relevancy threshold established by Rule 11-401.

**{18}** We turn now to whether the testimony of the State's DNA expert should have been excluded under Rule 11-403. Relevant evidence may be excluded under Rule 11-403 when its probative value "is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Evidence is unfairly prejudicial when it suggests making decisions on an improper basis. *State v. Anderson*, 1994-NMSC-089, ¶ 63, 118 N.M. 284, 881 P.2d 29.

**{19}** Invoking Rule 11-403, Defendant argues the "poor quality" of the Y-STR DNA evidence "was not adequately explained to the jury," the State's DNA expert's testimony should have been excluded as "unhelpful to the trier of fact and misleading," and the State "used this weak DNA evidence to mislead the jury into believing this was irrefutable proof that [Defendant] committed the crime." Defendant highlights the small amount of DNA tested and contends the Y-STR DNA exclusion statistics were "quite poor." Defendant concedes Y-STR DNA testing is generally regarded as reliable and fails to point to any particular testimony of the State's DNA expert that would have led the jury to reach a verdict on an improper basis.

**{20}** There is no question the DNA evidence was prejudicial to Defendant's case. But evidence is not unfairly prejudicial because its probative force damages Defendant's case. *Anderson*, 1994-NMSC-089, ¶ 63. The identity of the perpetrator was the central issue at trial and Defendant was the only male in the household who could not be excluded as a contributor to the multiple evidentiary samples that contained testable male DNA, including the vaginal swabs. This evidence was particularly probative and damaging in light of the defense theory that the real perpetrator was Scates, Sr. This theory was undercut by Scates, Sr. having been excluded as a contributor to the testable evidentiary samples, including the vaginal swabs. But Defendant has not shown how this evidence misled the jury, was inadequately explained, or was unfairly prejudicial under Rule 11-403.

**{21}** The "assessment of the validity and reliability of the conclusions drawn by the experts … is a jury question. The jury is free to believe or disbelieve the expert

testimony." *Anderson*, 1994-NMSC-089, ¶ 59. This includes when, as here, the DNA evidence indicates only that a suspect cannot be eliminated as a potential source of the DNA. *See id.* ¶¶ 8 n.2, 12 n.3; *cf. State v. Sills*, 1998-NMSC-009, ¶ 31, 125 N.M. 66, 957 P.2d 51 (rejecting argument that analysis of very small amounts of DNA and deficiencies in DNA statistics should have led to exclusion of DNA evidence). It is up to the jury to weigh the evidence on DNA testing and statistical calculations and to resolve any controversy with regard to that evidence. *Anderson*, 1994-NMSC-089, ¶¶ 58, 59.

**{22}** Defendant had ample opportunity to challenge the weight to be given the Y-STR DNA testimony of the State's DNA expert through cross-examination and through the testimony of his own DNA expert. Contrary to Defendant's conclusory assertion that the Y-STR DNA analysis was not adequately explained to the jury, the State's DNA expert explained that analysis in detail, including its limitations. The State's DNA expert agreed the Y-STR DNA results did not indicate a "match" to Defendant but only revealed Defendant could not be eliminated as the source of the testable male DNA. She also testified about transfer DNA, acknowledging the DNA of someone who has never touched an item can be found on that item.

**{23}** Laura Schile testified as an expert in DNA analysis and crime scene reconstruction on behalf of Defendant. Ms. Schile opined that given the small amount of DNA found on the vaginal swabs, the probability of DNA transfer was greater than the probability that the DNA got there as the result of digital penetration. Ms. Schile also testified she would have expected to see a large amount of good quality DNA if, as the State contended, there had been digital penetration by the Defendant. With regard to this expert testimony, the jury was properly instructed it could give the expert testimony whatever weight it thought it deserved or reject it entirely.

**{24}** For these reasons, we conclude the district court did not abuse its discretion when it admitted the Y-STR DNA evidence.

## B.      Closing Arguments

**{25}** Defendant argues the prosecutor committed misconduct when she exhorted the jury to "do the right thing" during closing argument rebuttal. He also asserts he was deprived of a reasonable opportunity to present his theory of the case during closing argument. In addressing these claims, we reiterate that the district court has wide discretion to control closing argument and both the defense and the prosecution are afforded wide latitude. *State v. Chamberlain*, 1991-NMSC-094, ¶ 26, 112 N.M. 723, 819 P.2d 673; *State v. Fry*, 2006-NMSC-001, ¶ 50, 138 N.M. 700, 126 P.3d 516.

### 1.      The Prosecutor's "Do the Right Thing" Comment

**{26}** Defendant challenges an isolated comment the prosecutor made during closing argument rebuttal. That comment was: "Don't be afraid to do the right thing." The prosecutor went on to clarify what she was asking the jury to do. She said:

How often in life do you get a chance to do justice? You have a chance to do that right now. And, yes, it's an emotional case[], and, yes, we all feel bad for little [A.R.], but the State is not asking you to convict the defendant because it's an emotional case. We're asking you to convict the defendant because all of the evidence, all of it, taken together points to the defendant. Not to [Scates, Sr.], not to a stranger, not to anybody else, to the defendant sitting right here in front of you.

**{27}** In determining whether a prosecutor's comment constituted reversible error we consider whether (1) the statement invades a distinct constitutional protection, (2) "the statement is isolated and brief, or repeated and pervasive," and (3) the defense invited the statement. *State v. Sosa*, 2009-NMSC-056, ¶ 26, 147 N.M. 351, 223 P.3d 348. When we apply these factors, we evaluate the challenged statement objectively, "in the context of the prosecutor's broader argument and the trial as whole." *Id.* "The general rule is that an isolated comment made during closing argument is not sufficient to warrant reversal." *Fry*, 2006-NMSC-001, ¶ 51 (internal quotation marks and citation omitted).

**{28}** Defendant argues the comment "impacted [his] right to a fair trial and to have the jury determine guilt based on the evidence presented." This generic assertion does not rise to an invasion of a distinct constitutional protection such as the Fifth Amendment right to remain silent. *Sosa*, 2009-NMSC-056, ¶¶ 27-28. *Cf. Sena*, 2020-NMSC-011, ¶ 18 (concluding defendant's right to fair trial was compromised when prosecutor made comment inviting jury to draw adverse inference from defendant exercising his Fifth Amendment privilege not to testify).

**{29}** The challenged comment was isolated and, as Defendant concedes, brief. Defendant contends it was "emphasized" because the jury heard the court overrule defense counsel's objection, thus giving the comment the court's "stamp of judicial approval." Suffice it to say when the district court resolves in a routine manner a defense objection to a comment made in closing, the court's ruling does not turn a prosecutor's isolated and brief comment into a repeated and pervasive one.

**{30}** The challenged comment was made in rebuttal, after defense counsel's closing argument to the jury. Defense counsel argued vigorously that the likely perpetrator was Scates, Sr., that Defendant's story about Scates, Sr. making him penetrate A.R.'s corpse was a coerced fantasy, that Defendant's false confession was "nonsense" because it was the product of a coercive interrogation, that there wasn't enough DNA evidence to support a conviction, and that Defendant's DNA was transferred into A.R.'s vagina not by his hand penetrating her vagina but by someone or something else. While we cannot say Defendant explicitly invited the prosecutor to argue that the jury "do the right thing," we can say he invited the prosecutor to comment on his claims of false confessions, his explanations for the DNA test results that implicated only him, and this theory that Scates, Sr. was the sole perpetrator. To this, the prosecutor might have responded by asking the jury to "do the right thing" by reviewing all the evidence adduced at trial.

**{31}** Looking at the rebuttal argument in its entirety, the prosecutor's "do the right thing" comment did not imply Defendant should be convicted for reasons other than the evidence adduced at trial. She did not imply that the jury would be doing the right thing only by reaching a certain verdict. To the contrary, immediately after having made that comment, she argued the jury should convict Defendant because all the evidence pointed to him. In this context, the challenged comment could also be understood as an admonition to the jury to do its duty to consider and weigh the evidence, which included that which challenged Defendant's version of events.

**{32}** Having considered the *Sosa* factors, we conclude the prosecutor's isolated comment did not "materially alter[] the trial or likely confuse[] the jury by distorting the evidence" such that Defendant was deprived of a fair trial. *Sosa*, 2009-NMSC-056, ¶ 34. The district court did not abuse its discretion in overruling the defense's objection to that one isolated comment.

### 2.    Defendant's Theory of the Case and Closing Argument

**{33}** Defendant asserts that a "criminal defendant has the right to a fair and impartial trial. U.S. Const. amend. VI." He also asserts that the "right to a fair trial demands a reasonable opportunity to present the defendant's theory of the case during closing argument." We recognize that "[c]losing argument is an aspect of a fair trial which is implicit in the Due Process Clause of the Fourteenth Amendment by which the States are bound." *Sena*, 2020-NMSC-011, ¶ 21 (internal quotation marks and citation omitted). Our review of Defendant's constitutional claim is de novo. *Id.* ¶ 15.

**{34}** Defendant contends the district court abused its discretion when it sustained the State's objection to defense counsel elaborating in closing on the assertion that Scates, Sr. "was implicated in multiple acts of molestation." Defendant claims that a "valid defense strategy is to point to another suspect as the more likely perpetrator" and argues that this ruling "erroneously restricted" his closing argument on that issue and "cut off a valid avenue of defense." We do not agree that Defendant's closing argument was erroneously restricted. Defendant was not denied the opportunity to argue Scates, Sr. was the perpetrator. Defense counsel did so consistently and emphatically throughout the trial and in closing argument. The jury knew Scates, Sr. was a registered sex offender and defense counsel directly accused him of having "used a glove from [his] room . . . to penetrate and strangle" A.R., which he denied. In closing, defense counsel discussed "a convicted pedophile becom[ing] a trusted and relied-upon witness for the State," referenced the "allegations against [Scates, Sr.]," and reminded the jury Scates, Sr. testified he had a "curiosity" toward images of young nude girls and that he admitted to touching his own granddaughter. Scates, Sr. was the focal point of Defendant's closing argument. Defense counsel referred to him at least thirty-four times. Even without being able to comment on additional allegations of molestation, defense counsel's closing argument made clear Defendant's position that Scates, Sr. could "well have been the perpetrator in this case."

**{35}** Viewing the closing argument in its entirety and given the wide discretion the district court has to control it, we conclude the district court did not unfairly restrict

Defendant's closing and did not act in an obviously erroneous, arbitrary, or unwarranted manner. *Chamberlain*, 1991-NMSC-094, ¶ 26. Accordingly, there was no abuse of discretion.[3]

## C. The District Court Did Not Abuse Its Discretion in Admitting Defendant's Whisper References from the Police Interview

**{36}** Defendant argues the Whisper references he made when he was left alone in the interview room and started talking to himself during one portion of the October police interview did not meet the relevancy threshold of Rule 11-401. The Whisper references included Defendant saying to himself: "I had to have done it after falling asleep"; "I hope that thing did not come out again. I can't handle that thing"; and "when did I do it?" He went on, saying to himself: "no one was safe around him if he got out of that box"; "that evil me, he was in the box"; "I hope they put me in a straightjacket, I don't want him coming out again"; "that me is not nice, that me is evil"; "how did he get out of that box?"; "Whisper was the scary one"; and "Whisper had to have come back." The defense indicates Defendant also said "Whisper wanted to kill."[4] The State counters there are two reasons the Whisper references were relevant. It asserts "the jury could have believed that Defendant was telling the truth" and "that he realized . . . he lost control of his normally-suppressed urges and killed A.R." It also asserts the statements evidenced consciousness of guilt.

**{37}** Evidence is relevant if it tends to make more or less probable a fact that is of consequence in determining the action. Rule 11-401. We resolve any doubt in favor of admissibility. *Stanley*, 2001-NMSC-037, ¶ 6. Here, the identity of the perpetrator was a fact of consequence at the trial given Defendant's assertion that he did not harm A.R. and his theory that Scates, Sr. sexually assaulted and killed A.R. Defendant acknowledges that the disputed issue at trial was the identity of the perpetrator yet claims "it is difficult to see how [his] statements about 'Whisper' make [him] as the perpetrator more or less probable." This argument strains credulity. Contrary to his claim at trial that he did not harm A.R., Defendant implicated himself in the October police interview when he said he "made [A.R.] that way," "clearly I killed my niece," and "I want to die right now just knowing I'm the one that did that." These are admissions that he committed the crimes. *See* Rule 11-801(D)(2)(a) NMRA (admissible non-hearsay statements include those offered against an opposing party that were made by the party in an individual capacity). He made these admissions before he made the

---

3Invoking the doctrine of cumulative error, Defendant argues the district court "both cut off a legitimate avenue of defense closing argument *and* placed the 'judicial stamp of approval' on the State's improper closing argument." "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial." *State v. Romero*, 2019-NMSC-007, ¶ 45, 435 P.3d 1231 (text only). Having concluded the district court did not abuse its discretion in how it handled the objections made during closing argument, the doctrine of cumulative error is not applicable. *Id.*; *State v. Samora*, 2013-NMSC-038, ¶ 28, 307 P.3d 328.

4We were not able to hear this statement on the portions of the record cited by the defense. The State does not dispute Defendant said this. Therefore, for purposes of the legal analysis, we assume Defendant said "Whisper wanted to kill" in the challenged portion of the interview.

Whisper statements. Having implicated himself as A.R.'s assailant and then claimed at trial that he did not harm A.R., the subsequent Whisper statements were additional evidence that Defendant believed he committed, or could have committed, the crimes he was on trial for. As such, they were relevant to the jury's assessment of whether Defendant was the perpetrator.

**{38}** Defendant also asserts the statements were inadmissible character evidence under Rule 11-404(B) NMRA because they portray Defendant as "scary" and suggest he had "a deviant character." Rule 11-404(B)(1) states in relevant part: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But such evidence may be admissible for another purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11-404(B)(2). We question whether all of the Whisper references constitute "other" acts evidence under Rule 11-404(B)(1). They evidence Defendant's own belief that he committed, or could commit, the crimes he was being charged with. This may suggest Defendant acted in a deviant way in committing the crimes he was charged with. But this is not necessarily evidence of *other* crimes, wrongs, or acts that Defendant acted in conformity with. However, because Defendant presented argument on Rule 11-404(B), we assume, without deciding, that some of the Whisper references could be viewed as character evidence and determine whether those statements were admissible under Rule 11-404(B)(2).

**{39}** Rule 11-404(B) is a rule of inclusion, not exclusion. *Bailey*, 2017-NMSC-001, ¶ 14. All evidence of other acts which is relevant to the issue at trial can be admitted unless that evidence shows only a propensity to commit the crime charged. *Id.* One permitted use of other acts evidence is to prove identity. Rule 11-404(B)(2). Identity was the key issue in this case and the Whisper references were made in the context of Defendant having said "Whisper wanted to kill"; "I had to have done it after falling asleep" and "when did I do it?"; "that evil me, he was in the box"; "that me is not nice, that me is evil"; and "how did he get out of that box?" These statements are probative of Defendant's belief that some part of him committed the crime. The State argues that the Whisper references also demonstrated Defendant's consciousness of guilt. Defendant told three different accounts of what happened that night. The first was that he didn't do it. The second arguably was that he did not remember doing it but Whisper had gotten out of the box and made him do it. The third account was that his step-grandfather forced him at gunpoint to penetrate A.R.'s corpse. Changes in Defendant's stories evidence consciousness of guilt, which is a permitted use under Rule 11-404(B). *State v. Martinez*, 1999-NMSC-018, ¶¶ 29-30, 127 N.M. 207, 979 P.2d 718. For these reasons, we conclude there was no error in admitting the Whisper references under Rule 11-404(B)(2).

**{40}** Having determined the district court did not abuse its discretion in admitting the evidence under Rule 11-401 and Rule 11-404(B)(2), we next address whether the district court abused its discretion in determining whether its probative value was substantially outweighed by the danger of unfair prejudice. *Martinez*, 1999-NMSC-018, ¶ 30. The court may exclude evidence "if its probative value is substantially outweighed

by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Rule 11-403. Evidence is unfairly prejudicial "if it is best characterized as sensational or shocking, provoking anger, inflaming passions, or arousing overwhelmingly sympathetic reactions, or provoking hostility or revulsion or punitive impulses, or appealing entirely to emotion against reason." *Bailey*, 2017-NMSC-001, ¶ 16 (text only). Because determining unfair prejudice is fact sensitive, trial judges are given much leeway in how they weigh probative value against probable dangers. *Id.*

**{41}** Defendant argues the Whisper references showed only that Defendant struggled with his mental health. He argues admitting evidence of his mental health struggles was prejudicial because of the potent public prejudice against people with mental illness, including an assumption that they are dangerous. The admission of the Whisper references is only erroneous if the prejudicial effect is unfair and substantially outweighs its probative value. They are probative of identity and consciousness of guilt. And while they may be prejudicial, the statements themselves were not sensational, revolting, shocking, or appealing only to emotion against reason, especially when compared to Defendant's unchallenged statements about his history of in-patient psychiatric treatment beginning when he was six years old and his admissions that "he made [A.R.] that way," "clearly I killed my niece," and "I want to die right now just knowing I'm the one that did that."

**{42}** Determining unfair prejudice is a fact-sensitive inquiry and we give much leeway to trial judges in how they weigh probative value against probable dangers. *Id.* Given the unchallenged testimony that was before the jury, the prejudicial effect of the challenged Whisper references did not outweigh its probative value. The district court did not abuse its discretion in admitting the Whisper references.

## D.  The District Court Did Not Abuse Its Discretion in Qualifying Detective Brown As an Expert in Bloodstain Pattern Analysis

**{43}** We next address whether the district court abused its discretion in qualifying Detective Aaron Brown as an expert in bloodstain pattern analysis. Defendant contends the district court abused its discretion in admitting Detective Brown as an expert because he had taken "only a handful of classes" and had written his first report for this case. The State counters Detective Brown had enough specialized knowledge from his training and education to assist the trier of fact and he had "far more training in a specialized area than would be available to a lay person."

**{44}** An expert witness may be qualified by "knowledge, skill, experience, training, or education." Rule 11-702 NMRA. The district court has wide discretion in determining expert qualifications. *State v. Sloan*, 2019-NMSC-019, ¶ 42, 453 P.3d 401; *State v. McDonald*, 1998-NMSC-034, ¶ 20, 126 N.M. 44, 966 P.2d 752 (emphasizing the disjunctive language of Rule 11-702 gives the district court wide discretion when qualifying an expert witness).

**{45}** In qualifying Detective Brown as an expert, the district court heard testimony about his knowledge, experience, and skill as a major crime scene detective and certified field investigator. He had 130 hours of bloodstain pattern analysis training and was a member of the International Association of Bloodstain Pattern Analysts. Detective Brown had worked on roughly nine cases during his training period and was the primary detective in six more, with 95% of those cases involving bloodstain pattern analysis. Any perceived deficiencies in Detective Brown's education and training are relevant to the weight the jury accords to an expert's testimony, not to the testimony's admissibility. *McDonald*, 1998-NMSC-034, ¶¶ 18-21.

**{46}** Here, the jury had ample opportunity to assess the weight to be given to Detective Brown's expert testimony. The defense cross-examined Detective Brown about his qualifications and called its own expert in bloodstain pattern analysis to refute Detective Brown's testimony. The jury was also properly instructed it could give Detective Brown's expert opinion testimony whatever weight it thought it deserved or reject it entirely. *Sloan*, 2019-NMSC-019, ¶ 44 (observing the jury was free to weigh the qualifications of an expert witness in blood splatter and entirely disregard his opinion). Given these circumstances, the district court did not abuse its discretion qualifying Detective Brown as an expert in bloodstain pattern analysis.

## IV.    CONCLUSION

**{47}** For the foregoing reasons, we affirm Defendant's convictions for criminal sexual penetration of a minor and child abuse resulting in death.

**{48}    IT IS SO ORDERED.**

**BRIANA H. ZAMORA, Justice**

**WE CONCUR:**

**DAVID K. THOMSON, Chief Justice**

**MICHAEL E. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**JULIE J. VARGAS, Justice**