This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date:  June 30, 2016**

**STATE OF NEW MEXICO,**

   Plaintiff-Appellee,

v.                                                        **NO. S-1-SC-34500**

**JONATHAN MONTOYA,**

   Defendant-Appellant.


**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**James Waylon Counts,  District Judge**


Law Works LLC
John A. McCall
Albuquerque, NM

for Appellant

Hector H. Balderas, Attorney General
M. Victoria Wilson, Assistant Attorney General
Santa Fe, NM

for Appellee

                              **DECISION**

**CHÁVEZ, Justice.**

{1}   Defendant Jonathan Montoya, who was eighteen years old and had an IQ of 69, confessed to shooting a gun from inside a car, which resulted in Victim's death. Victim was shot in both legs, and the heavy blood loss ultimately resulted in her dying from cardiac arrest. Defendant appeals his conviction of felony murder contrary to NMSA 1978, Section 30-2-1(B) (1994), and shooting from a motor vehicle contrary to NMSA 1978, Section 30-3-8(B) (1993). The issues on appeal comprise three groups. The first group involves issues relating to Defendant's confession. Defendant contends that his confession should have been suppressed because given his age, learning disability, and the circumstances of his confession, he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights. He also contends that the jury question regarding the voluntariness of his statement should have been bifurcated from the guilt phase of the trial and that the district court incorrectly instructed the jury regarding the voluntariness of his confession. In the second group, Defendant contends that the felony-murder conviction is invalid because the felony of shooting from a motor vehicle cannot be the predicate felony for felony murder, and the State did not prove the requisite mens rea for second-degree murder. In the third group, Defendant challenges the district court's exclusion of a portion of the opening statement by a prosecutor to a jury in the trial of a co-defendant, the court's admission of a 15-minute long video of Victim bleeding heavily at the scene of the shooting, and

2

the court's refusal to admit Defendant's entire confession under the rule of completeness. Consistent with *State v. Marquez*, 2016-NMSC-___, ¶ ___, ___ P.3d ___ (No. 34,418, June 30, 2016), we hold that the first-degree felony-murder conviction must be vacated. The felony of shooting from a motor vehicle—an elevated form of aggravated battery or assault—cannot be a predicate felony for a felony-murder conviction because shooting from a motor vehicle does not require a felonious purpose that transcends danger to the victim. Defendant's remaining issues are without merit. We remand to the district court to vacate the felony-murder conviction and conviction for shooting at or from a motor vehicle, and to resentence Defendant for second-degree murder. Defendant's other convictions are affirmed.

## I.    BACKGROUND

{2}    Around midnight on June 8, 2011, in Ruidoso Downs, New Mexico, Defendant met two women, Melissa Mathis and Alexias Torres, at a house where Defendant's cousin, Daniel Franco, was present. Mathis was distraught because she and Victim, who was her girlfriend, had broken up recently. Torres admitted to taking methamphetamine and oxycodone during this time period and stated that she and Mathis had also consumed alcohol.

{3}    After meeting, the three of them drove toward Alamogordo, New Mexico. Defendant did not want to travel to Alamogordo but Franco insisted, presumably to

3

keep the women safe. Before leaving, Defendant handed Torres a revolver. Defendant told Torres that he had the gun because Franco insisted he take it, but neither Defendant nor Torres wanted it, and therefore they kept the gun between them in the car.

**{4}** Defendant, Mathis, and Torres eventually arrived at a Burger King restaurant where Mathis noticed Victim in the parking lot. Victim refused to renew her relationship with Mathis, despite Torres's encouraging Victim to do so. During this exchange, Mathis allegedly said, "just show her," which Torres assumed meant the gun. At that time, Defendant allegedly had the gun in his possession.

**{5}** The situation escalated as Mathis became excited and uttered profanities. Torres instructed Defendant to display the revolver in response to Mathis's repeated insistence that the gun be shown, hoping that Mathis could be placated. Torres then heard gunshots. Defendant would later confess to firing these shots.

**{6}** Victim received four gunshot wounds, two in each leg. She fell to the ground and was pulled into the Burger King by a co-worker. Deputy Hal Alton testified that he arrived on the scene and attempted to administer aid. Victim later died from her wounds.

**{7}** Defendant was taken to the Alamogordo Department of Public Safety, where he was placed in an interview room and handcuffed to a wall. Defendant was

4

questioned by Sheriff Israel Valdez and Officer James Watts. During this videotaped interrogation, Defendant was read his *Miranda* rights. Defendant was then interrogated by Detective Mark Esquero while Detective Roger Schoolcraft took notes. During the second interrogation, which was also recorded, Defendant was again given his *Miranda* rights, and he subsequently signed a waiver form. After signing the waiver form, Defendant confessed to the shooting.

**II.      ISSUES REGARDING DEFENDANT'S CONFESSION**

**A.      Whether There Was a Valid Waiver of *Miranda* Rights**

{8}      Defendant argues that he did not validly waive his *Miranda* rights, and therefore his statements to law enforcement should be suppressed. Under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), law enforcement must advise a suspect during custodial interrogation that "he [or she] has a right to remain silent, that any statement he [or she] does make may be used as evidence against him [or her], and that he [or she] has a right to the presence of an attorney, either retained or appointed." Before questioning a suspect, law enforcement must obtain a knowing, intelligent, and voluntary waiver of the aforesaid rights. *Id.*

{9}      The State has the burden of demonstrating "by a preponderance of the evidence" that a waiver was knowingly, intelligently, and voluntarily made. *State v. Martinez*, 1999-NMSC-018, ¶ 14, 127 N.M. 207, 979 P.2d 718. Specifically, "[t]he

State must demonstrate that the waiver . . . was the product of a free and deliberate choice rather than intimidation, coercion, or deception and that it was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (internal quotation marks and citation omitted). In determining whether the State has met its burden, we consider the "totality of the circumstances" and contemplate facts such as "the mental and physical condition, background, experience, and conduct of the accused, as well as the conduct of the police." *Id.* (internal quotation marks and citations omitted). We also indulge "[e]very reasonable presumption against waiver." *Id.* (internal quotation marks and citation omitted).

{10} On appeal, the factual findings of the district court are accepted unless they are "clearly erroneous." *Id.* ¶ 15 (internal quotation marks and citation omitted). The evidence is "view[ed] . . . in the light most favorable to the district court's ruling." *Id.* (internal quotation marks and citation omitted). However, "[t]he ultimate determination of whether a valid waiver of Fifth Amendment rights has occurred . . . is a question of law which we review de novo." *Id.* First we will address whether Defendant's waiver of his *Miranda* warnings was knowing and intelligent.

{11} A knowing and intelligent waiver is one that is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to

6

abandon it." *State v. Gutierrez*, 2011-NMSC-024, ¶ 13, 150 N.M. 232, 258 P.3d 1024 (internal quotation marks and citation omitted). Defendant argues that he did not make a knowing and intelligent waiver because he was a sleep-deprived eighteen-year-old with an IQ of 69 when he was interrogated.

{12} Defendant's age alone is not enough for us to conclude that he did not knowingly and intelligently waive his rights. "[A] person who has reached the age of eighteen is considered an adult for most purposes." *State v. Aguirre*, 1978-NMCA-029, ¶ 4, 91 N.M. 672, 579 P.2d 798 (discussing the voluntariness of a confession); *see also id.* ¶¶ 2-9. In New Mexico persons *under* the age of eighteen are entitled to heightened criminal procedure protections. *See* NMSA 1978, § 32A-1-4(B) (2009) (defining a child as "a person who is less than eighteen years old"); NMSA 1978, § 32A-2-14 (2009) (enumerating the basic rights of children within the context of criminal procedure under the Delinquency Act of the Children's Code). "The capacity to waive Fifth Amendment rights is assumed for children over fifteen and for adults." *State v. DeAngelo M.*, 2015-NMCA-019, ¶ 8, 344 P.3d 1019, *aff'd in part, re'vd in part*, 2015-NMSC-033, 360 P.3d 1151. Thus, under New Mexico law, persons of eighteen years or older are not deemed to have diminished capacity to knowingly and intelligently waive their *Miranda* rights simply because they were eighteen years old during a custodial interrogation.

7

**{13}** Defendant's argument that his low IQ prevented him from knowingly and intelligently waiving his *Miranda* rights requires closer scrutiny. "[S]ubnormal intelligence" is "a . . . significant factor" in considering whether a defendant knowingly and voluntarily waived his *Miranda* rights. *See Aguilar v. State*, 1988-NMSC-004, ¶ 12, 106 N.M. 798, 751 P.2d 178. However, even where defendants present evidence that they suffer from conditions and disorders which affect their cognitive abilities, they must also present evidence that they lacked sufficient intelligence to understand their rights and the repercussions of waiving those rights. *See State v. Setser*, 1997-NMSC-004, ¶¶ 14-15, 122 N.M. 794, 932 P.2d 484 (holding that a sixteen-year-old defendant suffering from mental conditions and disorders that affected her cognitive abilities who was also alleged to be mentally and emotionally disabled nonetheless gave a voluntary confession after validly waiving her *Miranda* rights).

**{14}** In this case, Defendant's expert testified that Defendant is not mentally retarded, but he has a learning disability, likely with low verbal abilities, as well as low reading comprehension. Defendant's expert opined that these deficits impede Defendant's ability to understand *Miranda* rights. The expert concluded that Defendant did not understand the *Miranda* rights that were provided to him, given his mental state (i.e., he was stressed and tired) and lack of verbal fluency. The expert

8

also stated that Defendant did not understand the consequences of abandoning his *Miranda* rights because the explanations of rights that Defendant received were "rushed."

{15} However, Defendant's expert also opined that Defendant was able to understand communications that were given slowly and repeatedly, and the record reveals that the *Miranda* warnings were given to him repeatedly. During the first interview before reading Defendant his rights, Officer Valdez asked Defendant if he understood his *Miranda* rights and Defendant responded that he did, reciting the right to remain silent. Officer Valdez next read Defendant his rights, and after Defendant said that he understood his rights, Officer Valdez asked Defendant to sign a waiver of rights form, which Defendant did.

{16} Similarly, during the second interview, Detective Esquero read the advice of rights to Defendant, had Defendant read the rights himself, and then asked Defendant if he understood the rights, to which Defendant answered that he did. The repeated *Miranda* warnings, along with Defendant's own statements, support the inference that Defendant understood the *Miranda* rights he waived. Defendant had opportunities to notify law enforcement that he did not understand his rights, but stated that he knew his *Miranda* rights. Defendant's expert admitted that Defendant has some "basic" understanding of *Miranda* rights because he had received *Miranda* warnings in the

9

past and was able to recite the right to remain silent as an aspect of his rights. The district court did not err in concluding that Defendant made a knowing and intelligent waiver. *See State v. Garcia*, 2013-NMCA-064, ¶ 48, 302 P.3d 111 (upholding a district court denial of a motion to suppress and concluding that a knowing and intelligent waiver was made, in part because the defendant had opportunities to express a lack of understanding of *Miranda* rights and did not do so). We conclude that Defendant knowingly and intelligently waived his *Miranda* warnings. We next turn to whether his waiver was voluntary.

{17} When analyzing whether Defendant voluntarily waived his *Miranda* rights, it must be kept in mind that involuntary actions necessarily involve coercive police conduct. *State v. Fekete*,1995-NMSC-049, ¶ 35, 120 N.M. 290, 901 P.2d 708. Under the totality of the circumstances, there must be an element of police overreaching to warrant a conclusion that a person's waiver of his or her rights was involuntary. *State v. Munoz*, 1998-NMSC-048, ¶ 21, 126 N.M. 535, 972 P.2d 847.

{18} Defendant argues that his *Miranda* waiver was involuntary because the totality of the circumstances show that he was "detained and interrogated for close to six hours" when the police intentionally interrogated him while he was in a sleep-deprived state, so that the police could take advantage of his suggestibility due to his youth and learning disabilities. Defendant also alleges that the police induced him to

10

waive his rights by misrepresenting to him that he could return home if he spoke with them.

{19} Defendant's arguments are without merit because he cannot establish the necessary element of law enforcement coercion. First, the district court found that the "[l]ength of detention was not unreasonable." Defendant's detention was prolonged because law enforcement needed "time to respond to the dispatch, and conduct some preliminary investigation of the shooting before interviewing the suspects." In New Mexico, courts consider "both the length of the detention and the manner in which it is carried out" when determining whether the detention is lawful. *State v. Funderburg*, 2008-NMSC-026, ¶ 23, 144 N.M. 37, 183 P.3d 922 (internal quotation marks and citations omitted). Thus, Defendant's length of detention is not by itself evidence of law enforcement coercion.

{20} Second, Defendant's contention that he was sleep-deprived does not avail him. "While a finding that officers took advantage of a defendant's fatigue or weakened mental state might be relevant, the fact that a defendant was tired does not in itself resolve the issue of whether a confession was voluntary." *State v. Lobato*, 2006-NMCA-051, ¶ 11, 139 N.M. 431, 134 P.3d 122. Defendant was not intentionally sleep-deprived by law enforcement; he was allowed to nap during his detention, which suggests that law enforcement was not trying to deprive him of sleep. Moreover,

Defendant does not argue that the officers took advantage of his fatigue, and in any event there is no evidence that they did, so his *Miranda* waiver was not coerced. *Id.*

{21} Third, the district court found that although Defendant's learning disabilities favored the position that his *Miranda* waiver was not voluntary, Defendant was given his *Miranda* rights multiple times, which favored the State's position that the waiver was valid. The court then concluded that Defendant voluntarily waived his right to remain silent and voluntarily provided statements to law enforcement. These are not clearly erroneous findings. Indeed, the fact that Defendant received *Miranda* warnings multiple times would indicate that law enforcement was not trying to take advantage of his mental state.

{22} Fourth, law enforcement did not make any inappropriate promises to Defendant that induced him to waive his *Miranda* rights. "New Mexico cases seem to divide promises into four categories: express promises, implied promises, collateral promises and adjurations to tell the truth." *State v. Tindle*, 1986-NMCA-035, ¶ 23, 104 N.M. 195, 718 P.2d 705. Each category requires a corresponding analytical approach in determining whether a statement was made to law enforcement involuntarily. *See id.* ¶¶ 23-31.

{23} In this case, Defendant had asked under what circumstances he could go home, and law enforcement informed Defendant that his full cooperation was prerequisite

12

to any possibility of him going home. When Defendant made this inquiry, law enforcement was under the impression that he was merely a passenger in the car; consequently, law enforcement told Defendant that there was a chance he may go home. The district court found under these facts that there was no "express promise to Defendant of release from custody in exchange for confession."

{24} The district court did find that during Defendant's first interrogation, there was "certainly an implied promise of some degree of leniency, or at least [a] promise that [Defendant] could go home." Nevertheless, the district court found that the harmful effect of this implied promise was offset by the fact that Defendant was read his *Miranda* rights again during his second interrogation.

{25} An implied promise exists when "the accused could reasonably have inferred a promise going to the punishment for the crime to be confessed." *State v. Talayumptewa*, 2015-NMCA-008, ¶ 5, 341 P.3d 20 (internal quotation marks and citations omitted). The exchange between Defendant and law enforcement merely indicates that law enforcement informed Defendant of the possibility that he could be allowed to go home if he disclosed information that absolved him of culpability in Victim's shooting. At no point did law enforcement even imply that a confession would absolve Defendant, in whole or in part, of any crimes he committed. The facts of this case do not support a finding that an implied promise was made. *See, e.g.*,

13

*Lobato*, 2006-NMCA-051, ¶ 20 (officer's repeated statement that the defendant should confess to get treatment was not likely to be even an implied promise of leniency).

{26} However, even assuming that the district court's finding of an implied promise is proper, the voluntariness of Defendant's *Miranda* waiver was clearly not destroyed. In this case, the alleged implied promise was made during the first interrogation. However, Defendant was read his *Miranda* rights again before his second interrogation, and it was only after the second explanation of his rights that Defendant signed the waiver of rights form. Defendant confessed to shooting at Victim after he acknowledged that he understood his rights and waived his rights in writing. The chronological gap between the first and second interrogations supports a finding that Defendant was not induced to confess by an implied promise made during the first interrogation. We affirm the district court's conclusion that Defendant's waiver was voluntary and affirm the admission of Defendant's statement as evidence.

**B.      The Voluntariness Issue Was Not Required to Be Bifurcated from the Guilt Phase of the Trial**

{27} Defendant argues that "it was improper for the trial court to submit the issue of voluntariness of the confession by the Defendant to the jury that determined his guilt." Defendant's argument is inapposite to our jurisprudence and is without merit.

{28} New Mexico applies the "Massachusetts procedure" for admitting allegedly

14

involuntary confessions into evidence, *see Tindle*, 1986-NMCA-035, ¶ 21, which was followed in this case.[1]  Under the Massachusetts procedure, "to introduce a confession into evidence, the state must make a prima facie showing of voluntariness." *Id.*  The State does so "by establishing that the confession was not extracted by fear, coercion, hope of reward or any other improper inducement." *Id.*  "If the State fails to prove voluntariness by the preponderance of the evidence, the trial court must rule that the confession was involuntary as a matter of law." *Id.*  "If . . . the court finds, by a preponderance of the evidence, that the confession was voluntary, then the question of voluntariness goes to the jury." *Id.* ¶ 22.  The district court held a pretrial hearing to determine whether Defendant's confession was voluntary and concluded that it was before ultimately submitting the issue to the jury. The court also properly instructed the jury that it could not consider Defendant's statement for any purpose unless they first determined that Defendant voluntarily gave the statement—that it was freely made and not induced by promises or threats. The district court did not err in submitting the issues of voluntariness of confession and of guilt to the same jury.

---

[1]For a thorough discussion of the difference between the "New York procedure" and the "Massachusetts procedure" and their differences, *see Jackson v. Denno*, 378 U.S. 368, 377-80, 378 n.8, 394 (1964).

15

Defendant essentially asks us to apply the New York procedure,[2] which we refuse to do, as it is settled in our jurisdiction that New Mexico applies the Massachusetts procedure. *See, e.g.*, *Tindle*, 1986-NMCA-035, ¶ 21.

**C.      Whether the District Court Erred in Denying Defendant's Requested Jury Instruction that Modified the Uniform Jury Instruction**

{29}     Defendant contends that jury instruction 6,which is UJI 14-5040 NMRA, did not conform to the law based on the facts of this case. Jury instruction 6 provides that:

> Evidence has been admitted concerning a statement allegedly made by the defendant. Before you consider such statement for any purpose, you

---

[2]The *Jackson* Court analyzed the constitutionality of a New York procedure for admitting allegedly involuntary confessions into evidence. Under New York law at the time, the trial judge was required to:

> [M]ake a preliminary determination regarding a confession offered by the prosecution and exclude it if in no circumstances could the confession be deemed voluntary. But if the evidence presents a fair question as to its voluntariness, as where certain facts bearing on the issue are in dispute or where reasonable men could differ over the inferences to be drawn from undisputed facts, the judge must receive the confession and leave to the jury, under proper instructions, the ultimate determination of its voluntary character and also its truthfulness.

378 U.S. at 377 (footnotes omitted) (internal quotation marks and citation omitted). Under this procedure it was "impossible to discover whether the jury found the confession voluntary and relied upon it, or involuntary and supposedly ignored it," because the jury was only required to return a general verdict upon the ultimate question of guilt or innocence. *Id.* at 379. Whether the jury made a decision on the issue of the voluntariness of the confession or decided the defendant's guilt on the basis of an involuntary confession could not be known. *Id.* at 380.

16

must determine that the statement was given voluntarily. In determining whether a statement was voluntarily given, you should consider if it was freely made and not induced by promise or threat.

Defendant tendered a modified version of UJI 14-5040, which reads:

Evidence has been admitted concerning a statement allegedly made by the defendant. Before you consider such statement for any purpose, you must determine that the statement was given voluntarily. In determining whether a statement was voluntarily given, you should consider if it was freely made and not induced by promise, *threat or hope of reward. In determining whether the defendant voluntarily gave the statement, you are to consider the defendant's mental capacity.*

(Emphasis added.) Defendant argues that because *Aguilar*, 1988-NMSC-004, ¶ 13 held that "implied threats and promises, especially when knowingly made to a defendant with diminished mental capacity, rendered [a] confession involuntary as a matter of law," the jury instructions should clearly reflect *Aguilar*'s holding. (Internal quotation marks and citation omitted.)

{30} The question we must address is "whether a reasonable juror would have been confused or misdirected by the jury instruction." *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134 (internal quotation marks and citations omitted). A juror may suffer from confusion or misdirection "through omission or misstatement [if the instruction] fail[s] to provide the juror with an accurate rendition of the relevant law." *Id.* Conversely, a jury instruction does not need to include all of the circumstances the jury may consider, as long as the jury instruction fairly and

17

adequately states the law. *See State v. McFerran*, 1969-NMCA-084, ¶ 64, 80 N.M. 622, 459 P.2d 148.

{31}    The instruction given by the district court was Uniform Jury Instruction 14-5040, which as a uniform jury instruction approved by this Court is presumed to be a correct statement of the law. *State v. Wilson*, 1994-NMSC-009, ¶ 5, 116 N.M. 793, 867 P.2d 1175. The jury was instructed to determine whether Defendant's statements were voluntary, and in making that determination, the jurors were to consider whether the statement was freely made and not induced by promise or threat. We conclude that the jury instruction fairly and adequately states the law. The jury instruction did not need to include all of the circumstances that might be relevant as to whether Defendant's statements were the product of promises or threats. The details could and should be left to the argument of counsel. In addition, during closing argument in this case, Defendant thoroughly discussed how mental capacity may impact a finding of voluntariness. Thus, a jury instruction that further highlighted Defendant's arguments would have given undue emphasis to Defendant's perspective. *See State v. Sanders*, 2000-NMSC-032, ¶ 23, 129 N.M. 728, 13 P.3d 460. Therefore, we conclude that the district court properly gave the jury an unmodified version of UJI 14-5040.

**III.    ISSUES    REGARDING    DEFENDANT'S    FELONY-MURDER
            CONVICTION**

**A.      Whether Defendant Is Entitled to a Directed Verdict on the Felony-Murder Charge**

{32}      Defendant contends that he was entitled to a directed verdict on the first-degree felony-murder charge for two reasons.  First, Defendant argues that the crime of shooting at or from a motor vehicle contrary to Section 30-3-8(B) cannot serve as the predicate felony for felony murder.  Second, Defendant argues that he did not have the requisite mens rea for a felony-murder conviction.

**1.      *Shooting at or from a Motor Vehicle Cannot Serve as a Predicate Felony for Felony Murder***

{33}      Defendant relies on *State v. Pierce*, 1990-NMSC-027, ¶ 22, 109 N.M. 596, 788 P.2d 352, *modified by State v. Ortega*, 1991-NMSC-084, ¶¶ 21, 24, 26, 28, 112 N.M. 554, 817 P.2d 1196, to argue that shooting at or from a motor vehicle cannot be a predicate felony for felony murder.  *Pierce* provides that "[w]here the felony supporting felony murder is inherently dangerous, and where it is *independent of the act causing the death of the victim*, it may be used to support an alternative count of felony murder against a defendant . . . ."  *Id.* (emphasis added).  The requirement that the predicate felony be independent of the act that caused the death of a victim is part of the collateral-felony doctrine.  *See State v. Campos*, 1996-NMSC-043, ¶ 8, ¶ 8 n.1, 122 N.M. 148, 921 P.2d 1266 (discussing the collateral-felony doctrine).  Defendant argues that "shooting from the motor vehicle was not independent of the act causing

19

the death of the victim" because the shooting directly caused Victim's death, and therefore "under *Pierce*, such [a] felony cannot support felony murder." We agree with Defendant that shooting from a motor vehicle cannot be the predicate felony for a felony-murder conviction under the collateral-felony doctrine. *See Marquez*, 2016-NMSC-___, ¶ 52.

{34} In *Campos*, this Court addressed the collateral-felony doctrine in some detail. New Mexico's felony-murder rule is unique because "New Mexico does not abandon the mens rea requirement for murder, nor does it create a presumption that a defendant had intended to kill whenever a homicide occurs during the course of a felony." 1996-NMSC-043, ¶¶ 16-17. Instead, "[o]ur felony-murder rule only serves to raise second-degree murder to first-degree murder when the murder is committed in the course of a dangerous felony." *Id.* ¶ 17. The elevation of a second-degree murder into a first-degree murder occurs when the Legislature evinces an intent that certain crimes are serious enough to merit elevated punishment. *Id.* ¶ 18. Circumstances that merit the application of the felony-murder rule include "the commission of a first-degree felony or a lesser-degree felony that is itself inherently dangerous or is committed under circumstances that are inherently dangerous." *Id.*

{35} In light of the above, "the main concern in applying the felony-murder doctrine in New Mexico is that the prosecution may be able to elevate improperly the vast

20

majority of second-degree murders to first-degree murders by charging the underlying assaultive act as a predicate felony for the felony-murder doctrine." *Id.* ¶ 19. To address this concern, the collateral-felony doctrine in New Mexico precludes use of a felony that is a lesser-included offense of second-degree murder as a predicate felony for felony murder. *Id.* Whether a felony is a lesser-included offense requires application of the strict-elements test. *Id.* ¶ 22.

{36}  Under the strict-elements test,

> [A] court would find an offense to be a lesser-included offense of another only if the statutory elements of the lesser offense are a sub-set of the statutory elements of the greater offense such that it would be impossible ever to commit the greater offense without also committing the lesser offense.

*Id.* ¶ 20 (internal quotation marks and citation omitted). The *Campos* Court noted that forms of aggravated assault and aggravated battery "would always be deemed to be non-collateral even though, under some statutory definitions, aggravated battery and aggravated assault include one or more statutory elements that are not elements of second degree murder." *Id.* ¶ 23.

{37}  Recently in *Marquez* we clarified that the collateral-felony doctrine requires courts to consider the elements of a dangerous crime in the abstract, and only if the dangerous felony has a purpose independent of the purpose of assaulting or injuring the victim may the dangerous felony be used as a predicate for felony murder. We

21

concluded that shooting at or from a motor vehicle does not qualify as a predicate felony because the essence of the felony is assaulting or injuring a person, which is a form of aggravated assault or battery. 2016-NMSC-___, ¶¶ 23-25. Therefore, we remand to the district court to vacate Defendant's conviction for first-degree murder. Whether the judgment and sentence should be amended to reflect a conviction for second-degree murder or shooting from a motor vehicle resulting in great bodily injury—both of which carry a sentence of fifteen years, *see* NMSA 1978, § 31-18-15(A)(4) (2007)—turns on whether there was sufficient evidence to support the mens rea requirement for second-degree murder.

**2.      *Whether the Requisite Mens Rea for Second-Degree Murder Was Established***

**{38}**      Defendant contends that the mens rea requirement for second-degree murder was not established because he "did not know the nexus between the lethal act and strong probability of death." New Mexico requires that suspects possess the mens rea of second-degree murder to be convicted of felony murder. *Campos*, 1996-NMSC-043, ¶¶ 16-17. The mens rea element for second-degree murder is that the defendant "intended to kill or knew that his acts created a strong probability of death or great bodily harm." *State v. Griffin*, 1993-NMSC-071, ¶ 23, 116 N.M. 689, 866 P.2d 1156. The jury was correctly instructed regarding the mens rea requirement for felony murder.

22

**{39}** When determining whether the district court erred in not directing a verdict, we look at both the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the verdict. *State v. Garcia*, 1980-NMSC-141, ¶ 3, 95 N.M. 260, 620 P.2d 1285. A directed verdict is warranted only if there are no reasonable inferences from which the requisite intent may be found. *Id.* A defendant's intent is seldom susceptible to proof by direct evidence, yet we have consistently held that circumstantial evidence is sufficient to prove the requisite intent. *See, e.g.*, *State v. Flores*, 2010-NMSC-002, ¶ 19, 147 N.M. 542, 226 P.3d 641.

**{40}** In this case, Defendant admitted that he shot the gun from inside the car, asserting that he did so as a warning to those who were outside the car. Torres testified that she pulled the car up to where a group of people were standing outside the Burger King. She told Defendant to show the gun to Victim when multiple shots were fired by Defendant. In addition, the video recording from the lapel camera of one of the police officers showed the entry and exit wounds to Victim's legs, from which the jury could draw the reasonable inference that Defendant shot directly at Victim and not warning shots, as he asserted. *See State v. Astorga*, 2015-NMSC-007, ¶ 57, 343 P.3d 1245 ("[A] jury is free to reject [the defendant's] version of the facts." (second alteration in original) (internal quotation marks and citations omitted)).

**{41}** The jury could reasonably find that Defendant knew that there was a strong

23

probability that someone might die or experience great bodily harm when he discharged his gun toward Victim. *Accord State v. Varela*, 1999-NMSC-045, ¶ 21, 128 N.M. 454, 993 P.2d 1280 (noting that a jury could permissibly infer the mens rea for second-degree murder when the defendant shot at a dwelling that he knew to be occupied). We therefore affirm the district court's denial of the directed verdict motion. On remand, the district court should amend the judgment and sentence to reflect a jury conviction of second-degree murder because all of the elements of second-degree murder were found by the jury beyond a reasonable doubt when the jury found Defendant guilty of felony murder. *See State v. Tafoya*, 2012-NMSC-030, ¶ 34, 285 P.3d 604 (where the predicate felony is not appropriate if the record supports Defendant's conviction of second-degree murder beyond a reasonable doubt, this Court should remand to the district court to vacate the felony-murder conviction and for entry of judgment for second-degree murder).

## IV. ISSUES REGARDING THE DISTRICT COURT'S EVIDENTIARY RULINGS

### A. Whether the District Court Abused Its Discretion in Excluding the Introduction of a Prosecutor's Opening Statement from Another Trial

{42} Defendant argues that the district court abused its discretion in refusing to allow him to use a portion of the State's opening statement in Mathis's trial which concerned the testimony of witness Carrie D'Urbano. According to Defendant,

D'Urbano told law enforcement that (1) Mathis said that Victim was "going to get it," and (2) Mathis asked Torres to show D'Urbano that they had a gun. For Defendant, this testimony "cast[s] doubt on whether Defendant had possession of the gun which was allegedly used to shoot victim and whether Defendant was implicated in the plan to harm victim."

{43} The district court ruled that the opening statement was hearsay within hearsay because Defendant sought to admit into evidence what the prosecutor during a different trial said that another person (D'Urbano) said she heard others say. In addition, because D'Urbano is not a party-opponent, the statement was inadmissible. On appeal, Defendant asserts that the opening statement is admissible under Rule 11-801(D)(2)(b) NMRA, which concerns statements made by an opposing party, in this case, the State.

{44} A hearsay statement consists of an out-of-court statement offered to prove the truth of the matter asserted. Rule 11-801(C). "An out-of-court statement is inadmissible unless it is specifically excluded as non-hearsay under Rule 11-801(D) or falls within a recognized exception in the rules of evidence, *see, e.g.*, Rule 11-803 NMRA . . ., or is otherwise made admissible by rule or statute." *State v. McClaugherty*, 2003-NMSC-006, ¶ 17, 133 N.M. 459, 64 P.3d 486 (ruling on the interpretation of Rule 11-802 NMRA), *overruled on other grounds by State v.*

25

*Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110.  The relevant opening statement is as follows:

> [T]hey [referring to Mathis, Torres, and Defendant] stop at the house of a Carrie D'Urbano, who you will learn is a friend of . . . [Victim] and Ms. Mathis both.  *And you will hear that . . . Ms. Mathis*, at that point was driving her car, *and tells Ms. D'Urbano, pulls out a revolver, a 22 caliber revolver, says "we're going to go take care of* [*Victim*]" . . . .

Defendant's argument is without merit because the prosecutor did not have personal knowledge of what either Mathis or D'Urbano stated.  *See* Rule 11-602 NMRA ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may consist of the witness's own testimony.").  In this case, the prosecutor was simply alerting the jury about what it would hear when D'Urbano testified about statements she heard Mathis make (Mathis was being prosecuted in another case) about Mathis's, Torres's, and Defendant's plans to harm Victim.  The prosecutor's opening statement to the jury was not an obvious admission of fact that might have constituted an admission of a party opponent.  *See State v. Doe*, 1977-NMCA-078, ¶¶ 12-13, 91 N.M. 92, 570 P.2d 923.  The district court's refusal to allow a portion of the prosecutor's opening statement in the Mathis trial to be admitted as an admission of a party opponent in Defendant's (Montoya's) trial was not erroneous.

**B.     Whether the District Court Abused Its Discretion in Allowing the**

**Admission of a 15-Minute Long Videotape of Victim Bleeding to Death**

{45} Defendant next argues that the district court abused its discretion when it admitted a "fifteen minute videotape of the victim bleeding to death" that was "sensational" such that Defendant was unfairly prejudiced. Defendant asserts that the video "was not relevant to a contested issue as it was not contested that [Victim] was shot and bled." The video in question was taken from a law enforcement officer's lapel camera and depicts the officer's encounter with Victim at Burger King. Defense counsel objected to the admission of this evidence because it allegedly contained statements made by Victim that were inadmissible hearsay. The State responded by arguing that the statements made by Victim were admissible as either excited utterances or dying declarations. The district court agreed with the State and held that, at the very least, the statements made by Victim were admissible excited utterances. Defense counsel did not object on the basis that the lapel camera video was unfairly prejudicial under Rule 11-403 NMRA.

{46} In light of the above, Defendant failed to preserve the issue of unfair prejudice for appeal. "To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court *on the same grounds argued in the appellate court*." *Woolwine v. Furr's, Inc.*, 1987-NMCA-133, ¶ 20, 106 N.M. 492, 745 P.2d 717 (emphasis added). Therefore, Defendant failed to preserve the issue of unfair

27

prejudice. Rule 12-216(A) NMRA.

{47} In the alternative, Defendant argues that the admission of the video is fundamental error. However, "[f]undamental error only applies in exceptional circumstances when guilt is so doubtful that it would shock the judicial conscience to allow the conviction to stand." *State v. Gallegos*, 2009-NMSC-017, ¶ 27, 146 N.M. 88, 206 P.3d 993 (internal quotation marks and citations omitted). Here, Defendant confessed to the shooting, and there is corroborative evidence of his confession. Witness testimony indicates that he had possession of a gun immediately prior to the shooting and that he was instructed to display this gun to threaten Victim. Moreover, Victim was in fact shot and died from her wounds. Defendant contended that he only fired warning shots; however, the video provides evidence that at least one of the bullets that entered Victim's leg was a straight shot, which would allow the reasonable inference that Defendant did not fire warning shots, but instead fired directly at Victim. Therefore, the district court did not abuse its discretion in admitting the video evidence.

**C.      Whether the District Court Abused Its Discretion in Denying Defendant's Request that His Entire Statement Be Shown to the Jury**

{48} Defendant contends that the video of his interrogation by Detective Esquero should have been admitted in its entirety on the basis of the rule of completeness. *See*

Rule 11-106 NMRA (providing the rule of completeness). Apparently the State had edited out certain portions of the video because they concerned (1) Defendant's prior bad acts, (2) potential sentencing, and (3) self-serving statements made by Defendant. The State excised these portions because it feared a mistrial, and it did not want to put on Defendant's self-serving statements. The district court decided that the exclusion of the video's excised portions was proper because the excised portions do not provide additional context to what the State was showing through the video.

{49} Rule 11-106 provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that *in fairness ought to be considered at the same time*." (Emphasis added.) In interpreting Rule 11-106, we have explained that "[t]he primary purpose behind the rule of completeness is to eliminate misleading or deceptive impressions created by creative excerpting." *State v. Guerra*, 2012-NMSC-014, ¶ 41, 278 P.3d 1031 (internal quotation marks and citation omitted). The party invoking Rule 11-106 must show that the portion of the recording he or she seeks to introduce "is relevant to the issue in dispute and qualifies or explains the subject matter of the [recording that was just] admitted." *State v. Barr*, 2009-NMSC-024, ¶ 36, 146 N.M. 301, 210 P.3d 198, *overruled on other grounds by Tollardo*, 2012-NMSC-008, 275 P.3d 110. In this case, Defendant does

29

not explain how the excised portions further provide context for the admitted portions of Detective Esquero's interrogation. Therefore, Defendant's argument is without merit and the district court did not abuse its discretion by refusing to admit the remainder of the recorded statement under the rule of completeness.

## V. CONCLUSION

{50} We remand to the district court to vacate the felony-murder conviction and the conviction for shooting at or from a motor vehicle and to resentence Defendant for second-degree murder. Defendant's other convictions are affirmed.

{51} **IT IS SO ORDERED.**


_____

**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**


_____

**CHARLES W. DANIELS, Chief Justice**


_____

**PETRA JIMENEZ MAES, Justice**

_____

**BARBARA J. VIGIL, Justice**


**JUDITH K. NAKAMURA, Justice, concurring in part and dissenting in part**

31

**NAKAMURA, Justice (concurring in part, dissenting in part)**

**{52}** For the reasons articulated in my dissenting opinion in *State v. Marquez*, 2016-NMSC-____, ¶¶ 62-81, ___ P.3d ____ (Nakamura, J., dissenting), I believe that shooting at or from a motor vehicle, a violation of NMSA 1978, § 30-3-8(B) (1993), is a collateral felony and, thus, may serve as a predicate felony for felony murder. Accordingly, I do not agree that Defendant's first-degree felony-murder conviction must be vacated. For this reason, I respectfully dissent. I concur, however, with the majority that the remainder of the issues Defendant raises on appeal are without merit and that Defendant's other convictions should be affirmed.

_____
**JUDITH K. NAKAMURA, Justice**

37